United States District Court

For the Northern District of California

1

2

3

4

5

6

7            IN THE UNITED STATES DISTRICT COURT

8         FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   MMCA GROUP, LTD.,                    No. C-06-7067 MMC

11              Plaintiff,                **ORDER GRANTING HEWLETT-
                                          PACKARD COMPANY'S MOTION TO**
12      v.                                **DISQUALIFY PLAINTIFF'S COUNSEL;
                                          VACATING HEARING; CONTINUING**
13                                        **CASE MANAGEMENT CONFERENCE;
                                          VACATING HEARING DATES ON ALL**
14   HEWLETT-PACKARD COMPANY, et al.,     **PENDING MOTIONS**

15              Defendants
     _____/    (Docket No. 21)

16

17        Before the Court is defendant Hewlett-Packard Company's ("HP") motion, filed

18   January 19, 2007, to disqualify plaintiff MMCA Group, Ltd.'s ("MMCA") counsel.  MMCA

19   has filed opposition to the motion; HP has filed a reply.  Having considered the papers filed

20   in support of and in opposition to the motion, the Court finds the matter appropriate for

21   resolution without oral argument, see Civil L.R. 7-1(b), hereby VACATES the March 2,

22   2007 hearing, and rules as follows.

23                               **BACKGROUND**

24        As alleged in the complaint, MMCA is an "investigative firm specializing in

25   Intellectual Property matters, including investigation of copyright and trademark

26   counterfeiting."  (See First Amended Complaint ("FAC") ¶ 22.)  MMCA alleges it "began

27   doing investigative work for HP" in 1985, and that HP, in 1991, hired MMCA "as its

28   investigative contractor for HP's printer supplies Anti-Counterfeiting program."  (See id.)

     MMCA further alleges that for more than ten years, MMCA worked for HP on

1   "investigations throughout the world involving counterfeit LaserJet and inkjet printer

2   supplies, resulting in the seizure and impound of thousands of counterfeit products."  (See

3   id. ¶ 23.)

4         According to MMCA, "[t]he identity and contact information for MMCA employees

5   and associates was always regarded by MMCA and HP as proprietary to MMCA."  (See id.

6   ¶ 24.)  In 2003, HP and MMCA entered into HP Services Agreement #HPOP6638, which,

7   MMCA alleges, expressly provides that MMCA is the owner of trade secrets that include

8   the "means and methods used to provide investigative services and investigative functions"

9   to HP and further provides that neither HP nor MMCA "shall solicit to hire the other party's

10  employees without prior written permission."  (See id. ¶ 35.)

11        The instant action, as characterized by MMCA, "concerns breaches by HP of the

12  Service Agreement that it entered into with MMCA for investigative services in March 2003;

13  interference by all defendants[1] in the contractual relationships of MMCA with associates in

14  the LA [Latin America] Region and EMEA [Europe/Middle East/Africa] Region and

15  interference by all defendants with the prospective economic advantage of MMCA," as well

16  as "the misappropriation of MMCA trade secrets, to wit, the identity and contact information

17  of its employees and foreign associates in the LA Region and EMEA Region."  (See Opp.

18  at 2:10-15.)  MMCA asserts causes of action for interference with prospective economic

19  advantage, interference with contractual relations, breach of contract, misappropriation of

20  trade secrets, breach of the implied covenant of good faith and fair dealing, and conspiracy.

21

22        HP now moves to disqualify MMCA's counsel, Mark Pettinari ("Pettinari"), on the

23  ground that Pettinari previously served as HP's outside counsel and "was extensively

24  involved in the MMCA/HP relationship."   (See Motion at 1:7-15.)

25  / /

26  ————————————

27        [1] The defendants to the instant action are HP, Pinkerton's, Inc., Business Risks
    International, Limited, PICA, Rodolfo Diaz, Luis Ortega, Warren Rother, Robert Cozzolina,
28  and Kevin Hunsaker.

**LEGAL STANDARD**

Rule 3-310(E) of the Rules of Professional Conduct of the State Bar of California provides:

> A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

See Cal. Rules of Prof'l Conduct R. 3-310(E). The California Supreme Court has held, in interpreting Rule 3-310(E), that "[w]here an attorney successively represents clients with adverse interests, and where the subjects of the two representations are substantially related, the need to protect the first client's confidential information requires that the attorney be disqualified from the second representation." See People ex. rel. Dept. of Corporations v. Speedee Oil Change Systems Inc., 20 Cal. 4th 1135, 1146 (1999); see also County of Los Angeles v. United States District Court for the Central District of California (In re County of Los Angeles), 223 F.3d 990, 995 (9th Cir. 2000) ("Because we apply state law in determining matters of disqualification, we must follow the reasoned view of the state supreme court when it has spoken on the issue.")

In determining "whether there is a substantial relationship between successive representations, a court must first determine whether the attorney had a direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation." See City and County of San Francisco v. Cobra Solutions, Inc., 38 Cal. 4th 839, 847 (2006).[2] "If the former representation involved such a direct relationship with the client, the former client need not prove that the attorney possesses actual confidential information." Id. "Instead, the attorney is presumed to possess confidential information if the subject of the prior representation put the attorney in a position in which confidences

---

[2] For purposes of a disqualification motion, a "direct" professional relationship is defined as a relationship "where the lawyer was personally involved in providing legal advice and services to the former client." See Jessen v. Hartford Casualty Ins. Co., 111 Cal. App. 4th 698, 709 (2003).

3

1   material to the current representation would normally have been imparted to counsel." Id.

2       "When the attorney's contact with the client was not direct, then the court examines

3   both the attorney's relationship to the prior client and the relationship between the prior and

4   the present representation." Id. "If the subjects of the prior representation are such as to

5   'make it likely the attorney acquired confidential information' that is relevant and material to

6   the present representation, then the two representations are substantially related." Id.

7   (quoting Jessen, 111 Cal. App. 4th at 711). "When a substantial relationship between the

8   two representations is established, the attorney is automatically disqualified from

9   representing the second client." Id.

10      The California Supreme Court nevertheless has cautioned that courts, in ruling on

11  motions to disqualify counsel, "must examine these motions carefully to ensure that

12  literalism does not deny the parties substantial justice." See Speedee Oil, 20 Cal. 4th at

13  1145. "Depending on the circumstances, a disqualification motion may involve such

14  considerations as a client's right to chosen counsel, an attorney's interest in representing a

15  client, the financial burden on a client to replace disqualified counsel, and the possibility

16  that tactical abuse underlies the disqualification motion." Id. Ultimately, however,

17  "disqualification motions involve a conflict between the clients' right to counsel of their

18  choice and the need to maintain ethical standards of professional responsibility," and the

19  Court's "paramount concern must be to preserve public trust in the scrupulous

20  administration of justice and the integrity of the bar." Id.

21                                **DISCUSSION**

22      From 1991 to 1997, Pettinari served as one of HP's outside counsel, and, during that

23  time period, personally billed "upwards of 2,700 hours of work for HP." (See Mayes Decl.

24  ¶¶ 4, 5.) According to Robert Mayes ("Mayes"), HP's in-house counsel, and John Tiedge

25  ("Tiedge"), HP's trademark counsel, "HP trusted Mr. Pettinari to act as a liaison between it

26  and MMCA" in conducting counterfeiting investigations, and "Pettinari's billing records

27  confirm that he was significantly involved in the relationship between HP and MMCA." (See

28

                                      4

1   Mayes Decl. ¶ 14; Tiedge Decl. ¶ 10.)  Mayes and Tiedge further attest:

2       Pettinari instructed MMCA on how to conduct HP's investigations.  He
        attended meetings with Morgan Cherry of MMCA; he directed MMCA's
3       investigative activities; he assisted federal marshals in their execution of
        seizure orders and reviewed evidence and documents seized; he reviewed
4       MMCA's reports; he instructed MMCA on post-seizure activity; and he
        accompanied Mr. Cherry to meetings with defendants and their attorneys.
5       Through all of this, Mr. Pettinari was provided confidential information
        concerning HP's relationships with its outside investigators, specifically HP's
6       relationship with MMCA.  In managing and directing MMCA in these cases,
        Mr. Pettinari was acting on behalf of HP; to my knowledge, he never
7       represented MMCA in the anti-counterfeiting cases.

8   (See Mayes Decl. ¶ 14; Tiedge Decl. ¶ 10.)  Mayes further attests that Pettinari

9   represented HP in several anti-counterfeiting cases in which he was the lead litigating

10  counsel for HP.  (See Mayes Decl. ¶¶ 6-9; see also Tiedge Decl. ¶ 4.)  According to Mayes,

11  Pettinari "also represented HP in at least four other cases and several other matters

12  unrelated to counterfeiting, but which involved strategy discussions and communications

13  with [Mayes] and other top-level in-house counsel and managers at HP."  (See id. ¶ 10.)

14  Mayes and Tiedge each attest:

15      Throughout the cases on which I was HP's case manager, I worked directly
        with Mr. Pettinari.  We often discussed and evaluated discovery, strategy,
16      case planning, trial and settlement strategy, settlement negotiations, and HP's
        general and specific objectives in each case.  Mr. Pettinari advised HP on
17      litigation, trial, and settlement strategies and was privy to HP's litigation
        philosophy and key decision-makers.
18

19  (See id. ¶ 11.)

20      Pettinari does not contest any of the above-referenced statements by Mayes and

21  Tiedge.  Pettinari concedes that he served as outside counsel for HP "in matters involving

22  claims of trademark and service mark infringement and counterfeiting, trade dress

23  infringement, and copyright infringement and counterfeiting" and that, during his

24  representation of HP, he "worked with MMCA for the investigative services needed on the

25  cases he handled." (See Pettinari Decl. ¶ 3.)  Pettinari attests, however, that he "never

26  represented HP or MMCA in connection with their contractual relationship with each other"

27  and was "never made privy to the contractual relationship that existed between HP and

28  MMCA."  (See id. ¶ 5.)  Additionally, Pettinari attests, he never "represented HP in

5

1   connection with any activity . . . in the LA Region or in the EMEA Region" and was "never

2   privy [to] litigation strategy involving counterfeiting actions in foreign countries." (See

3   id. ¶ 6.)

4        It is undisputed that Pettinari was engaged in a "direct" professional relationship with

5   HP because he was "personally involved in providing legal advice and services to [such]

6   former client." See Jessen, 111 Cal. App. 4th at 709.  Accordingly, Pettinari is "presumed to

7   possess confidential information if the subject of the prior representation put [him] in a

8   position in which confidences material to the current representation would normally have

9   been imparted to counsel." See Cobra Solutions, 38 Cal. 4th at 847.

10       Although Pettinari argues that his prior representation of HP involved different legal

11   and factual issues than those presented by the current action, California courts do not

12   require that the legal and factual issues raised in the prior representation be identical to

13   those raised in the current representation.  Rather, "successive representations will be

14   'substantially related' when the evidence before the trial court supports a rational

15   conclusion that [confidential] information material to the evaluation, prosecution, settlement

16   or accomplishment of the former representation given its factual and legal issues is also

17   material in the evaluation, prosecution, settlement or accomplishment of the current

18   representation given its factual and legal issues." See Jessen, 111 Cal. App. 4th at 713;

19   see also Farris v. Fireman's Fund Ins. Co., 119 Cal. App. 4th 671, 624 (2004) (clarifying

20   "that the 'information' addressed by the Jessen formulation . . . is 'confidential'

21   information"). "[W]hether [counsel] actually possesses confidential information that would

22   work to his advantage in his current representation is not the test." Id. at 683.

23       Here, as discussed above, Pettinari worked for HP in a position of confidence for

24   years; he was lead litigation counsel for HP in several anti-counterfeiting cases, and acted

25   as HP's liaison with MMCA in conducting counterfeiting investigations.  Pettinari does not

26   deny that he "was provided confidential information concerning HP's relationships with its

27   outside investigators, specifically HP's relationship with MMCA." (See Mayes Decl. ¶ 14;

28

Tiedge Decl. ¶ 10.)  The undisputed evidence of Pettinari's long-standing involvement in overseeing HP's relationship with MMCA "supports a rational conclusion" that he obtained confidential information in the course of that relationship that is material to his current representation of MMCA in the instant action against HP.  See, e.g., Farris, 119 Cal. App. 4th at 677, 689 (disqualifying counsel from representing client in bad faith action against insurer where counsel previously acted as "key member" of insurer's coverage department).  That Pettinari ceased working with HP as long as ten years ago, and that he retains "none of the files . . . from any of the cases involving [his] prior representation of HP," (see Pettinari Decl. ¶ 7), is immaterial, as there has been no showing of significant "changes in corporate structure" or "turn over in management."  See Brand v. 20th Century Ins. Co./21st Century Ins. Co., 124 Cal. App. 4th 594, 607 (2004) (finding immaterial counsel's "professed failure to recall any confidential information obtained during his representation" or "the passage of 12 years" since that prior representation ended); Farris, 119 Cal. App. 4th at 628 (noting court could "envision circumstances where the passage of time might be shown to have eliminated a prior substantial relationship due to such events as changes in corporate structure, turn over in management, and the like").[3]

Accordingly, Pettinari's prior representation of HP and his current representation of MMCA are "substantially related" and Pettinari is "automatically disqualified" from representing MMCA in the instant action.  See Cobra Solutions, 38 Cal. 4th at 847.

**CONCLUSION**

For the reasons set forth above, HP's motion to disqualify plaintiff's counsel is hereby GRANTED.  MMCA shall substitute new counsel within 30 days of the date of this

---

[3] Although Pettinari correctly observes that the contract between HP and MMCA at issue herein was entered in 2003, after he ceased working for HP, MMCA additionally alleges a trade secret claim, which claim asserts that, from the time MMCA began working for HP in 1985, "[t]he identity and contact information for MMCA employees and associates was always regarded by MMCA and HP as proprietary to MMCA."  (See FAC ¶¶ 22-24, 143.)  Such allegation relates to the period of time during which Pettinari acted as liaison between HP and MMCA.  Consequently, Pettinari cannot show that the passage of time has eliminated all relevance to the instant litigation of the information to which he was privy as a result of his work with MMCA on behalf of HP.

1  order.  The March 2, 2007 case management conference is hereby CONTINUED to April 6,

2  2007; a joint case management statement shall be filed no later than March 31, 2007.  The

3  hearing dates on all pending motions in the instant action are hereby VACATED, and may

4  be renoticed after the case management conference.

5           This order terminates Docket No. 21.

6           **IT IS SO ORDERED**.

7  Dated: February 23, 2007                        _____

8                                                   MAXINE M. CHESNEY
                                                    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28