United States District Court

For the Northern District of California

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                    NORTHERN DISTRICT OF CALIFORNIA

7

8    MMCA GROUP, LTD.,                          No. C-06-7067 MMC (EMC)

9              Plaintiff,

10        v.                                     **ORDER DENYING PLAINTIFF'S**
                                                 **MOTION FOR LEAVE TO TAKE**
11   HEWLETT-PACKARD COMPANY, *et al.*,          **JURISDICTIONAL DISCOVERY**

12             Defendants.                       **(Docket No. 63)**

13

14   _____/

15

16

17        Plaintiff MMCA Group, Ltd. has filed suit against Defendants Hewlett-Packard Co. ("HP"),

18   Pinkerton Consulting & Investigations Europe, PICA, and various individuals employed or formerly

19   employed by HP.  The majority of the individual defendants -- more specifically, Warren Rother,

20   Robert Cozzolina, Luis Ortega, and Rodolfo Diaz -- have filed motions to dismiss for lack of

21   personal jurisdiction.  *See* Docket Nos. 38, 42, 46, 50.  MMCA now seeks an order permitting it to

22   conduct jurisdictional discovery in order to oppose the individual defendants' motions to dismiss.

23   Judge Chesney referred MMCA's motion for leave to take jurisdictional discovery (as well as all

24   future discovery disputes) to the undersigned for resolution.  Having reviewed the parties' briefs and

25   accompanying submissions, as well as all other evidence of record, the Court hereby **DENIES**

26   MMCA's motion.

27

28

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. FACTUAL & PROCEDURAL BACKGROUND

A.     Allegations in MMCA's Complaint

In its first amended complaint ("FAC"), which is the operative complaint in the case, MMCA alleges as follows.

MMCA is a worldwide investigative firm specializing in intellectual property matters, including investigation of copyright and trademark counterfeiting. *See* FAC ¶ 22.  In 1991, HP hired MMCA as its investigative contractor for HP's printer supplies anti-counterfeiting program. *See id.*

In October 2002, HP changed the structure of its anti-counterfeiting program from one that was centrally managed to one that was regionally managed. *See id.* ¶ 27.  Four regions were established: North America ("NA"); Latin America ("LA"); Europe, Middle East, and Asia ("EMEA"); and Asia Pacific ("AP"). *See id.*  As part of HP's reorganization of the IPG anti-counterfeiting program, HP also created a council to coordinate and manage all IPG anti-counterfeiting activities. *See id.* ¶ 28.

From October 2002 to July 2004, **Mr. Diaz**, a citizen of Florida, was the LA regional manager for HP's imaging and printing supplies group ("IPG") anti-counterfeiting program. *See id.* ¶ 9.  In July 2004, Mr. Diaz became worldwide manager for that program. *See id.*  Mr. Diaz left HP in December 2005 and now is the COO of PICA, another investigation service company. *See id.* ¶¶ 8-9.

From July 2004 to May 2006, **Mr. Ortega**, a citizen of Florida, was the LA regional manager for the IPG anti-counterfeiting program. *See id.* ¶ 10.  His employment with HP ended in May 2006. *See id.*

From September 2004 to September 2006, **Mr. Rother**, a citizen of South Africa, was the EMEA regional manager for the IPG anti-counterfeiting program. *See id.* ¶ 11.

During the relevant time period, **Mr. Cozzolina**, a citizen of New Jersey, was the worldwide investigations program manager for HP's IPG. *See id.* ¶ 12.

In March 2003, HP and MMCA entered into a Service Agreement. *See id.* ¶ 35.  The Agreement contained a nonsolicitation clause which provided that, during the term of the Agreement and for one year thereafter, "'neither HP nor MMCA shall solicit to hire the other party's employees

**United States District Court**
For the Northern District of California

1    without prior written permission.'" *Id.* Apart from the Agreement, "[i]t was established policy that

2    HP would not have access to the contact information of any MMCA employee or associate and that

3    MMCA as an independent contractor to HP would be the sole contact to HP in connection with its

4    investigations of counterfeit product and packaging anywhere in the world." *Id.* ¶ 16. "The identity

5    and contact information for MMCA employees and associates was [sic] always regarded by MMCA

6    and HP as proprietary to MMCA." *Id.*

7         Both the Service Agreement and the established policies were allegedly violated by HP and

8    HP's employees, including Mr. Diaz, Mr. Ortega, Mr. Rother, and Mr. Cozzolina. For example:

9    (1)  In January 2004, Mr. Diaz, while the LA regional manager, asked that MMCA investigators

10        put their full names and not their initials on incident reports related to investigations. *See id.*

11        ¶ 49.

12   (2)  In August 2004, shortly after becoming worldwide anti-counterfeiting program manager for

13        HP, Mr. Diaz demanded the proprietary names and contact information for all MMCA

14        employees and associates nationwide. *See id.* ¶ 55.

15   (3)  In August 2004, Mr. Ortega, as LA regional manager for the IPG anti-counterfeiting

16        program, used his personal relationship with a MMCA secretary to obtain confidential

17        information regarding MMCA relations with its employees and associates in Colombia. *See*

18        *id.* ¶ 58.

19   (4)  In October 2004, shortly after Mr. Ortega terminated the Service Agreement between HP and

20        MMCA for investigations in the LA region and PICA was hired to replace MMCA, a

21        MMCA employee Gabriela Toranzo was offered a position with and was eventually hired by

22        PICA. *See id.* ¶¶ 62-64. Ms. Toranzo's identity and contact information was provided to

23        PICA by either Mr. Ortega and/or Mr. Diaz. *See id.* ¶ 63. Ms. Toranzo was involved in a

24        personal relationship with Mr. Diaz. *See id.* ¶ 57.

25   (5)  In March 2005, during a meeting in Istanbul, Turkey, Mr. Diaz and Mr. Rother (the regional

26        manager for EMEA) sought identity and contact information from all MMCA individuals

27        they met. *See id.* ¶ 80.

28

3

**United States District Court**
For the Northern District of California

1  (6)    In August 2006, MMCA was informed that Mr. Cozzolina, worldwide investigations

2         program manager for HP's IPG, had directly contacted a MMCA associate in Germany and

3         solicited his services on behalf of HP for the IPG anti-counterfeiting program in the EMEA

4         region.  *See id.* ¶ 108.

5  (7)    In August 2006, Mr. Rother, the EMEA regional manager, demanded that he be able to speak

6         directly to MMCA employees and associates in the EMEA region so that they could answer

7         his questions and clarify charges on the MMCA invoices.  *See id.* ¶ 112.

8  (8)    In August 2006, MMCA learned that Mr. Cozzolina, worldwide investigations program

9         manager for HP's IPG, had provided the identity and contact information for a MMCA

10        associate in Argentina to PICA.  *See id.* ¶ 114.

11        Based on, *inter alia*, the above acts, MMCA alleges the following causes of action against

12  the individual defendants:

13  (1)    Interference with prospective economic advantage.  This claim is based on the individual

14        defendants' contacting and solicitation of MMCA employees and associates, while they were

15        under contractual employment with MMCA.  *See id.* ¶ 122.  According to MMCA, the

16        individual defendants "interfered with the MMCA's prospective economic advantage in that

17        MMCA has lost key employees and associates to competitors, lost the advantages it held of

18        having multiple investigators in key geographic regions of the world, and it no longer has the

19        same breadth and depth of investigators available to service its clients throughout the world."

20        *Id.* ¶ 124.

21  (2)    Interference with contractual relations.  According to MMCA, the individual defendants

22        engaged in acts and conduct which interfered with MMCA's performance of the Service

23        Agreement with HP and which interfered with the contracts between MMCA and its

24        employees and associates.  *See id.* ¶ 132.

25  (3)    Conspiracy.

26  B.    <u>Declarations of Individual Defendants</u>

27        As noted above, after MMCA initiated this lawsuit, Mr. Rother, Mr. Cozzolina, Mr. Ortega,

28  and Mr. Diaz all filed motions contesting personal jurisdiction in this forum.  Each of the individual

4

**United States District Court**
For the Northern District of California

1    defendants submitted declarations in support of his motion to dismiss and/or in conjunction with the

2    currently pending motion.

3         In his declaration, **Mr. Rother** states that he has been an employee of Hewlett-Packard

4    South Africa (Pty) Limited ("HP South Africa") since June 1, 1999. *See* Rother Decl. ¶ 3. HP

5    South Africa is a wholly owned subsidiary of HP. *See id.* Mr. Rother has never worked directly for

6    HP. *See id.* ¶ 5. Nor has he ever worked in California or been employed by a California company.

7    *See id.* He has visited California only once in his life -- more specifically, in December 2004 to

8    attend a meeting of the HP IPG anti-counterfeiting and fraud program worldwide council, of which

9    he was a member. *See id.* ¶ 10. He has only communicated "occasionally" with HP employees

10   based in California. *See id.* ¶ 11 (describing those communications with specificity). Mr. Rother

11   states that he is unaware of any other communications with anyone in California except for those

12   specifically described. *See id.* ¶ 12.

13        In his declaration, **Mr. Cozzolina** states that he has been employed by HP since May 2004

14   but that he has never traveled to California on HP business and works out of his home in New

15   Jersey. *See* Cozzolina Decl. ¶¶ 3, 8. In the past ten years, he has only been to California one time --

16   more specifically, in September 2001 while employed as a consultant for the federal government.

17   *See id.* ¶ 6. Mr. Cozzolina communicates only "occasionally" with HP employees based on

18   California. *See id.* ¶ 9. He communicates with HP's California-based outside counsel, Howard

19   Rice, on a regular basis -- one or two times each month -- but on legal matters unrelated to the

20   instant case. *See id.* ¶ 10. In 2004, Mr. Cozzolina sent an e-mail in which a MMCA associate --

21   who is located in California -- was carbon copied. *See id.* ¶ 11. The e-mail concerned in

22   investigation by HP in California. *See id.* This is the only communication that he has had with a

23   MMCA employee or associate based in California. *See id.* At the hearing on MMCA's motion for

24   leave to take jurisdictional discovery, counsel for Mr. Cozzolina provided a supplemental

25   declaration from Mr. Cozzolina. The Court admitted the supplemental declaration because it is

26   responsive to a declaration filed by MMCA with its reply brief.

27        In his declaration, **Mr. Ortega** states that he was an employee of HP (from July 2004 to May

28   2006) but that, while employed there, he worked out of Florida only. *See* Ortega Decl. ¶ 3. In the

United States District Court

For the Northern District of California

1  past five years, he has visited California only once -- more specifically, in December 2004, to attend

2  a business meeting unrelated to MMCA.  *See id.* ¶ 4.  (It is not clear whether this is the same

3  December 2004 meeting to which Mr. Rother refers in his declaration.)  Mr. Ortega does not address

4  what communications, if any, he had with HP employees based in California but states that he

5  "reported exclusively to HP personnel in the Miami Office."  *Id.* ¶ 3.  Mr. Ortega also states that the

6  communications he has had with MMCA and PICA were not initiated from or received in

7  California, nor did they take place in California.  *See id.* ¶¶ 6-7.

8         Finally, in his declaration, **Mr. Diaz** states that he was an employee of HP but that, while

9  employed there, he worked out of Florida only.  *See* Diaz Decl. ¶ 4.  In the past five years, he has

10  traveled to California only five times.  *See id.* ¶ 8.  From 2002 to 2005, he traveled to California one

11  time each year for internal HP business meetings.  *See id.*  Mr. Diaz does not address what

12  communications, if any, he had with HP employees based in California but states that "none of the

13  MMCA representatives with whom [he] had dealings were California residents or were present in

14  California when I communicated with them."  *Id.* ¶ 7.

15                          **II.   DISCUSSION**

16  A.    Legal Standard

17         "A district court is vested with broad discretion to permit or deny [jurisdictional] discovery."

18  *Laub v. United States DOI*, 342 F.3d 1080, 1093 (9th Cir. 2003).  Jurisdictional discovery should

19  ordinarily be granted where jurisdictional facts are contested or more facts are needed.  *See id.*; *see*

20  *also Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977) (stating

21  that discovery "should be granted where pertinent facts bearing on the question of jurisdiction are

22  controverted . . . or where a more satisfactory showing of the facts is necessary") (internal quotation

23  marks omitted).  *See, e.g.*, *In re Dynamic Random Access Memory Antitrust Litig.*, 2005-2 Trade

24  Cases (CCH) 75,013 (N.D. Cal. Nov. 7, 2005) (denying jurisdictional discovery because "plaintiffs

25  have made no showing that any sworn testimony by defendants is disputed, and have not pointed to

26  any facts that, if shown, would warrant the exercise of personal jurisdiction").

27         However, "[w]here a plaintiff's claim of personal jurisdiction appears to be both attenuated

28  and based on bare allegations in the face of specific denials made by the defendants, [a] [c]ourt need

**United States District Court**

For the Northern District of California

1    not permit even limited discovery . . . ." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1160 (9th Cir.

2    2006) (internal quotation marks omitted).  In addition, a court may deny discovery where "it is clear

3    that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction."

4    *Laub*, 342 F.3d at 1093 (internal quotation marks omitted).  *See, e.g.*, *Pebble Beach*, 453 F.3d at

5    1160 (concluding that additional discovery would not be helpful because, as a matter of law, "a

6    passive website and domain name are an insufficient basis for asserting personal jurisdiction" and

7    defendant's website was a passive website).

8        The Ninth Circuit has stated that a decision to deny discovery "will not be disturbed except

9    upon the clearest showing that the denial of discovery results in actual and substantial prejudice to

10    the complaining litigant.  Prejudice is established if there is a reasonable probability that the

11    outcome would have been different had discovery been allowed."  *Laub*, 342 F.3d at 1093 (internal

12    quotation marks omitted).  In *Laub*, the Ninth Circuit indicated that the denial of discovery was

13    prejudicial because the documents offered by the plaintiff suggested that there was "at least an

14    arguable claim" of jurisdiction.  *Id.*

15    B.    <u>Discovery Regarding Individual Defendants' Contacts with California</u>

16        The parties agree that because this case is brought under diversity jurisdiction, California law

17    governs the analysis of personal jurisdiction.  "Where, as here, there is no applicable federal statute

18    governing personal jurisdiction, the law of the state in which the district court sits applies. . . .

19    California's long-arm statute allows courts to exercise personal jurisdiction over defendants to the

20    extent permitted by the Due Process Clause of the United States Constitution."  *Core-Vent Corp. v.*

21    *Nobel Indus. AB*, 11 F.3d 1482, 1484 (9th Cir. 1993).  Accordingly, California and federal law on

22    personal jurisdiction and Due Process coincide.  Where there is a material divergence in case law,

23    the Court so notes below.

24        1.    <u>General Jurisdiction</u>

25        Based on the declarations submitted by the individual defendants -- the contents of which are

26    largely uncontroverted by MMCA, even taking into account the Byrne declaration submitted by

27    MMCA -- MMCA has failed to establish that further discovery is likely to yield facts sufficient to

28    establish general jurisdiction.  For a court to have general jurisdiction, there must be something

**United States District Court**
For the Northern District of California

1    equivalent to the physical presence of the defendant in the forum.  *See Tuazon v. R.J. Reynolds*

2    *Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir. 2006) (noting that, for general jurisdiction to attach, a

3    defendant's contacts with the forum must approximate physical presence).  In *Burger King Corp. v.*

4    *Rudzewicz*, 471 U.S. 462 (1985), the Supreme Court pointed out that "it is an inescapable fact of

5    modern commercial life that a substantial amount of commercial business is transacted solely by

6    mail and wire communications across state lines, thus obviating the need for physical presence

7    within a State in which business is conducted."  *Id.* at 476.  Even so, contacts must be systematic and

8    continuous in order to give rise to general jurisdiction, *see Metropolitan Life Ins. Co. v.*

9    *Robertson-Ceco Corp.*, 84 F.3d 560, 572 (2d Cir. 1996) (indicating that extensive mail order and

10   telephone sales could support general jurisdiction if sufficiently continuous and systematic), and

11   Ninth Circuit case law indicates that communications across state lines rarely rise to that level to

12   support general jurisdiction.  *See Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1331 (9th Cir. 1984)

13   (concluding that solicitation of business through visits, telephone calls, and telexes to the forum state

14   did not support general jurisdiction); *Thos. P. Gonzalez Corp. v. Consejo Nacional De Produccion*

15   *De Costa Rica*, 614 F.2d 1247, 1254 (9th Cir. 1980) ("[U]se of the mails, telephone, or other

16   international communications simply do not qualify as purposeful activity invoking the benefits and

17   protection of the state."); *see also Noonan v. Winston Co.*, 135 F.3d 85, 92-93 (1st Cir. 1998)

18   (finding nonresident company's regular and frequent telephone calls, faxes, and letters to resident

19   company to solicit business insufficient to establish general jurisdiction).  Nothing in the allegations

20   of the complaint or declarations submitted by MMCA, particularly in the face of the undisputed

21   facts contained in defendants' declarations, even approaches a basis for finding general jurisdiction.

22   The Court therefore turns to the question of whether discovery is warranted with respect to specific

23   jurisdiction.

24          2.      Specific Jurisdiction

25   Under Ninth Circuit law,

26          a court may exercise "specific jurisdiction" when the following
              requirements are met:

27

28          (1)     The non-resident defendant must purposefully direct his
                    activities or consummate some transaction with the forum or

1   resident thereof; *or* perform some act by which he purposefully
2   avails himself of the privileges of conducting activities in the
    forum, thereby invoking the benefits and protections of its
3   laws;

    (2)   the claim must be one which arises out of or relates to the
4         defendant's forum-related activities; and

5   (3)   the exercise of jurisdiction must comport with fair play and
          substantial justice, i.e. it must be reasonable.
6

7   *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (emphasis added).

8          MMCA argues that discovery is warranted with respect to the issue of specific jurisdiction

9   because it is likely that there are discoverable facts which would establish such jurisdiction.  In

10  particular, MMCA points to (1) the individual defendants' use of HP's Data Management System

11  ("DMS"), which was created and maintained at HP's headquarters in California and (2) the

12  individual defendants' communications with the California-based HP council which coordinated and

13  managed all IPG anti-counterfeiting activities.

14         The Court rejects MMCA's contention that further discovery is warranted to explore the

15  individual defendants' use of the DMS.  There is no evidence that the DMS is maintained at HP's

16  headquarters in California.  The FAC does not contain any such allegations, *see* FAC ¶¶ 43-47, and

17  Mr. Cozzolina has now submitted a supplemental declaration which states that the DMS has never

18  been based in California.  *See* Supp. Cozzolina Decl. ¶ 2 (stating that the DMS is based in Virginia).

19  The Court does not have any reason to suspect that this statement by Mr. Cozzolina, made under

20  penalty of perjury, is not true, and MMCA conceded as much at the hearing.  Moreover, it is

21  doubtful that the mere fact that individual defendants allegedly used a database -- even one

22  maintained in California -- establishes specific jurisdiction.  MMCA does not dispute that the key

23  wrongful acts alleged in the complaint -- soliciting MMCA employees -- took place outside of

24  California.  MMCA has not submitted any case law establishing the principle that acquiring

25  information from the forum state which facilitates the ultimate wrongful conduct occurring entirely

26  elsewhere, establishes specific jurisdiction.

27         As for MMCA's contention that further discovery is warranted to explore the individual

28  defendants' communications with the HP council, the Court is likewise not persuaded.  As a

United States District Court

For the Northern District of California

1  preliminary matter, it is not clear that the HP council is, as MMCA claims, California based.

2  Thomas Byrne, a senior case manager at MMCA who served as the "designated central point of

3  contact for MMCA for the investigative services that were provided" to HP's IPG, Byrne Decl. ¶ 2,

4  suggests that the HP council is California based because the chair of the council, Mee-Leng Wang,

5  has an office at HP in Cupertino. *See id.* ¶ 2.  But even if Ms. Wang is the chair of the council, that

6  fact alone does not establish that the council is California based; Ms. Wang is only one member of

7  the council.  Furthermore, Ms. Wang's position does not establish that the HP council meetings were

8  "conducted from California." *Id.* ¶ 4.  Defendants assert that the council is comprised of a large

9  group of individuals residing throughout the nation and the world.  MMCA has not produced any

10  evidence, other than that relating to Ms. Wang, that suggests the council's center of gravity resides

11  in California.

12      However, even assuming that the HP council was California based, there are other

13  insurmountable problems for MMCA.  "When a nonresident defendant commits a tort within the

14  state . . . that tortious conduct amounts to sufficient minimum contacts with the state by the

15  defendant to constitutionally permit courts within that state . . . to exercise personal adjudicative

16  jurisdiction . . ." *Guidry v. United States Tobacco Co., Inc.*, 188 F.3d 619, 628 (5th Cir. 1999); *see*

17  *also* 4A Wright & Miller, Fed. Prac. & Proc. § 1069.1 (noting that, "[i]f a foreign corporation

18  commits a tortious act within the forum state, . . . a federal court within that state will exercise

19  jurisdiction over the corporation"). *See, e.g.*, *In re Automobile Antitrust Cases I & II*, 135 Cal. App.

20  4th 100, 123 (2005) ("California courts may properly exercise personal jurisdiction over one who

21  commits a tort or who causes a tort to be committed within this state.").  However, there is nothing

22  in the complaint or declarations suggesting the alleged tortious interference were committed within

23  the state.  As noted above, MMCA has not alleged that any of the individual defendants committed

24  the tortious acts of wrongful solicitation in or to California.  Defendants' declaration state the

25  contrary.

26      Therefore, MMCA's only basis for specific jurisdiction would be grounded on a conspiracy

27  theory of jurisdiction -- *i.e.*, that the individual defendants are subject to suit in California because

28  they conspire with the HP council, which has committed forum-related acts that are imputable to the

**United States District Court**

For the Northern District of California

1  individual defendants.  But MMCA did not offer a conspiracy theory of jurisdiction in any of its

2  briefing to the Court.  Rather, the issue arose only the day before the hearing, when the Court *sua*

3  *sponte* asked the parties to provide authority on the issue.  Although this issue was thus effectively

4  waived by MMCA, the Court addresses the merits.

5      As pointed out by the individual defendants, the majority of courts in California have held

6  that the forum-related activity of co-conspirators cannot be attributed or imputed to nonresident

7  defendants.  *See In re Automobile Antitrust Cases I & II*, 135 Cal. App. 4th 100, 118 (2005)

8  ("Jurisdictional facts shown must pertain to each nonresident defendant individually, even in an

9  alleged conspiracy."); *Mansour v. Superior Court of Orange County*, 38 Cal. App. 4th 1750, 1754-

10  55, 1760 (1995) (stating that "California does not recognize conspiracy as a basis for acquiring

11  personal jurisdiction over a party" and thus rejecting plaintiff's argument that "a party is subject to

12  suit in California because it belongs to a conspiracy and a coconspirator has committed

13  forum-related acts which are alleged to be imputable to it"); *Edmunds v. Superior Court*, 24 Cal.

14  App. 4th 221, 233 (1994) ("[E]ven though [plaintiff] has made allegations of civil conspiracy against

15  [defendant], for purposes of assuming personal jurisdiction, the purposes of other parties in the

16  particular transaction cannot be imputed to the defendant . . . ."); *Kaiser Aetna v. Deal*, 86 Cal. App.

17  3d 896, 901 (1978) ("Allegations of conspiracy do not establish as a matter of law that if there is one

18  resident conspirator, jurisdiction may be exercised over nonresident conspirators.  '[The] purpose of

19  other parties cannot be imputed . . . .'"); *Tiffany Records, Inc. v. M. B. Krupp Distributors, Inc.*, 276

20  Cal. App. 2d 610, 621 (1969) ("[T]he issue here is not simply whether there was a conspiracy.  It is

21  whether respondents' acts, if any, done pursuant to the alleged conspiracy were such that they can be

22  said to have been doing business in California so as to be subject to jurisdiction.").  *See also McKay*

23  *v. Hagaseth*, No. C-06-1377 MMC, 2007 WL 1056784, at *2 n.3 (N.D. Cal. Apr. 6, 2007) (stating

24  that "California courts have rejected [a conspiracy] theory [of jurisdiction]").  *But see Taylor-Rish v.*

25  *Multitech Corp.*, 217 Cal. App. 3d 103, 114 (1990) (in dictum, stating that "the acts of a

26  coconspirator within California may give rise to jurisdiction over a coconspirator in another state").

27      Similarly, although the Ninth Circuit has not made any definitive ruling, "the validity of

28  conspiracy theory of jurisdiction in [the] circuit is in doubt.  In *Piedmont Label Co. v. Sun Garden*

11

United States District Court

For the Northern District of California

1   *Packing Co.*, 598 F.2d 491 (9th Cir. 1979), the Ninth Circuit expressly rejected 'any implication . . .

2   that members of a conspiracy, as agents of one another, 'transact business' for venue purposes in

3   any district where one of them transacts business.'"   *General Steel Domestic Sales, LLC v. Suthers*,

4   No. CIV. S-06-411 LKK/KJM, 2007 U.S. Dist. LEXIS 19231, at *15 (E.D. Cal. Mar. 2, 2007); *see*

5   *also Dynamic Random Access Memory*, 2005-2 Trade Cases (CCH) 75,013 ("[T]he court declines

6   plaintiffs' invitation to adopt the conspiracy theory of personal jurisdiction."); *Kipperman v.*

7   *McCone*, 422 F. Supp. 860, 873 n.14 (N.D. Cal. 1976) (rejecting " plaintiff's assertion that personal

8   jurisdiction over alleged co-conspirators may be acquired vicariously through the forum-related

9   conduct of any single conspirator"; "personal jurisdiction over any non-resident individual must be

10  premised upon forum-related acts personally committed by the individual" and "[i]mputed conduct

11  is a connection too tenuous").

12      As discussed above, MMCA has proffered nothing to suggest that any of the individual

13  defendants had substantial contact with California.  Furthermore, there is no evidence, as noted

14  above, that the council was based in California.  Thus, "it is clear that further discovery would not

15  demonstrate facts sufficient to constitute a basis for [specific] jurisdiction."  *Laub*, 342 F.3d at 1093

16  (internal quotation marks omitted).  MMCA has not pointed to any disputed issues of fact material to

17  establishing jurisdiction under the law discussed above.  These are not even "base allegations" that

18  would support personal jurisdiction.  *Pebble Beach*, 453 F.3d at 1160.[1]

19  ///

20  ///

21  ///

22

23  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

    [1] In *Piedmont*, the court addressed briefly the issue of jurisdictional discovery: "Sun Garden
24  argues that even if the co-conspirator theory of venue is no longer accepted in this Circuit, we should
    remand this case to the district court to permit Sun Garden to complete discovery into Piedmont's
25  relationship with the forum.  If the district court had prevented Sun Garden from presenting evidence
    of Piedmont's independent relationship to the forum, we would be sympathetic to Sun Garden's
26  argument.  The record indicates, however, that Sun Garden chose to rely solely on the co-conspirator
    theory of venue in the face of Piedmont's evidence that it had no contact with the state of California.
27  Plaintiff had the burden of showing that venue was properly laid in the Northern District of California.
    It utterly failed to do so.  Thus, we need not remand this case to the district court to permit further
28  discovery."  *Piedmont*, 598 F.2d at 496.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court denies MMCA's request for leave to take jurisdictional discovery with respect to the individual defendants Mr. Rother, Mr. Cozzolina, Mr. Ortega, and Mr. Diaz.

This order disposes of Docket No. 63.

IT IS SO ORDERED.

Dated:  May 8, 2007

_____
EDWARD M. CHEN
United States Magistrate Judge