Frederick J. Geonetta (SBN 114824)
LITTON & GEONETTA, LLP
120 Montgomery Street, Suite 1600
San Francisco, CA  94104
Tel:  (415) 421-4770
Fax:  (415) 421-4785

Kenneth N. Frucht, (SBN 178881)
LAW OFFICES OF KENNETH FRUCHT
120 Montgomery Street, Suite 1600
San Francisco, CA 94104
Tel: (415) 392-4844
Fax: (415) 392-7973

Attorneys for Plaintiff
MMCA Group, Ltd.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MMCA GROUP, LTD., a Virginia corporation,<br><br>    Plaintiff<br><br>    v.<br><br>HEWLETT-PACKARD COMPANY, a Delaware corporation, PINKERTON'S, INC., a Delaware corporation, d/b/a PINKERTON CONSULTING & INVESTIGATIONS – EUROPE, BUSINESS RISKS INTERNATIONAL, LIMITED, an United Kingdom corporation d/b/a PINKERTON CONSULTING & INVESTIGATIONS – EUROPE, PICA, an Ohio corporation, RODOLFO DIAZ, an individual, LUIS ORTEGA, an individual, WARREN ROTHER, an individual alien, ROBERT COZZOLINA, an individual, KEVIN HUNSAKER, an individual,<br><br>    Defendants. | Civil Action No.  CV 06-07067-MMC (EMC)<br><br><br>**PLAINTIFF MMCA'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT HEWLETT-PACKARD COMPANY'S MOTION FOR SUMMARY JUDGMENT OR ALTERNAVELY MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br><br>Date:       January 9, 2009<br>Time:      9:00 a.m.<br>Place:     Courtroom 7, 19th Floor<br>Judge:    Hon. Maxine M. Chesney |

1

CIVIL ACTION NO.: CV 06-07067-MMC (EMC)
**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT HP'S MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

I.      INTRODUCTION…………………………………………………………   1

I.      FACTUAL STATEMENT…………………………………………………..   3

        A.      MMCA's Formation and Development of its Means and Methods……………   3

        B.      MMCA's Work With HP………………………………………………   5

                1.      HP Replaces MMCA in LAR and Passes Trade Secrets to PICA………..   8

                2.      HP Replaces MMCA in EMEA and Delivers Trade Secrets to
                        Pinkerton…………………………………………………………..   12

II.     LEGAL ARGUMENT…………………………………………………   14

        A.      Standard on Summary Judgment……………………………………………..   14

        B.      MMCA'S Contract Claims are Meritorious………………………………….   15

                1.      HP did not Terminate the Master Services Agreement…………………   15

                2.      MMCA Properly Claims Breach of the Non-Solicitation Clause………   16

                3.      MMCA's Damages are not Precluded by the Services Agreement……   14

                4.      Even if the Limitation of Liability Provision is Enforceable, Which
                        it is not, MMCA is entitled to the Benefit-of-the-Bargain Damages…….   17

        C.      Triable Issues of Fact Exist on MMCA's Claim of Misappropriation of
                Trade Secrets…………………………………………………   18

                1.      The Identities and Contact Information of MMCA's Operatives
                        MMCA's Were Confidential Trade Secrets…………...........................   18

                2.      MMCA's Method are Trade Secrets……………………………   20

        D.      MMCA States a Claim for Interference with Contractual Relations……………   22

                1.      MMCA Entered Into Written Contracts With its Employees
                        and Operatives……………………………………………………..   22

                2.      It is Unreasonable for HP to Assert it was not Aware of MMCA's Agent
                        Contracts. ……………………………………………………   22

                3.      HP's Interference with MMCA's Contracts was a Significant Factor
                        Causing Breach……………………………………………………   23

        E.      MMCA Cannot State an Actionable Claim for Interference with Prospective
                Economic Advantage against HP ……………………………………………   23

i

1

F.    HP Breached the Implied Covenant of Good Faith and Fair Dealing…………..    23

2

G.    HP Wrongly Asserts MMCA Cannot State a Claim for Conspiracy…………….    24

3

IV.    CONCLUSION…………………………………………………………………    25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CIVIL ACTION NO.:  CV 06-07067-MMC (EMC)
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT HP'S MOTION FOR SUMMARY JUDGMENT

1

**<u>TABLE OF AUTHORITIES</u>**

2
<u>Anderson v. Liberty Lobby, Inc.</u> (1986)
3
        477 U.S. 242 ……………………………............  15
<u>Celotex Corp. v. Catrett</u> (1986)
4
        477 U.S. 317 ……………….....................................................  14
<u>Cincinnati SMSA Ltd. v. Cincinnati Bell</u> (Del. 1998)
5
        708 A.2d 989 ……………………………………………  23
<u>Data Management Internationale, Inc. v. Saraga</u> (Del. Super. July 25, 2007)
6
        C.A. No. 05C-05-108, 2007, 2007 Del. Super. LEXIS 412……………………………..  23
<u>Del. Express Shuttle v. Older</u> (2002)
7
        Del. Ch. Lexis 124 ……………………………………………..  19
8
<u>Dionisi v. DeCampli</u> (1995)   Del. Ch. Lexis 88   …………………………………………  19
<u>Dunlap v. State Farm Fire & Cas. Co.</u> 42 (Del. 2005)
9
        878 A.2d 434………………………………………………………… 24
10
<u>Greenly v. Cooper</u> (1978)
        77 Cal.App.3d 382……………………………………………… 19
11
<u>Hampton v. Warren-Wolfe Associates, Inc.</u> (Del.Super. 2004)
        02C-10-037 WLW ……………………………………………… 17
12
<u>Irwin & Leighton, Inc. v. W.M. Anderson Co.</u> (Del. Ch. 1987)
13
        532 A.2d 983………………………………………………………  22
<u>J.A. Jones Const. Co. v. City of Dover,</u> (Del.Super. 1977)
14
        372 A.2d 540……………………………………………………..  17
<u>JJ White, Inc. v. Metro Merch. Mart</u> (Del Super. 1954)
15
        107 A.2d 892……………………………………………………..  17
<u>Kalmanovitz v. G. Heileman Brewing Co.</u> (D. Del. 1984)
16
        595 F. Supp. 1385………………………………………………..  23
<u>Kewanee v. Bicron</u> (1974)
17
        416 U.S. 470………………………………………………………  20
18
<u>Kronenberg v. Katz,</u> (Del.Ch. 2004)
        872 A.2d 568………………………………………………………  16
19
<u>Miles Inc. v. Cookson Am.</u> (1994)
         Del. Ch. Lexis 221……………………………………………….  18
20
<u>Morlife Inc. v. Perry</u>  (1997)
        56 Cal.App.4th 514 ……………………………………………..  19
21
<u>Paradee Oil Co., v. Phillips Pet. Co.</u> (Del.Ch. 1974)
22
        320 A.2d 769………………………………………………………..  15
<u>Parfi Holding v. Mirror Image Internet</u> (Del.Ch. 2001)
23
        794 A.2d 1211…………………………………………………….  22
<u>Patterson-Woods V. Rlty. Enter.</u> (Del.Super. 2008)
24
        05C-01-224-JOH…………………………………………………  24
25
<u>RHIS, Inc. v. Boyce,</u> 18924 (Del.Ch. 9-26-2001)…………………………………………  16
<u>RKI, Inc. v. Grimes,</u> (N.D.Ill. 2001)
26
        177 F. Supp.2d 859………………………………………………….  17
<u>Sanirab Corp. v. Sunroc Corp.</u> (2002)
27
        Del. Super. Lexis 3509…………………………………………..  20
<u>Self Directed Placement Corp. v. Control Data Corp.,</u> (9th Cir. 1990)

iii

908 F.2d 462…………………………………………………………………………… 20

SmithKline Beecham Pharms. V. Merck & Co. (2002)
766 A.2d 442…………………………………………………………………………… 24

Town & Country House & Home Service v. Newbery (N.Y. 1957)
N.Y.2d 554………………………………………………………………………… 19

T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n. (9th Cir. 1987)
809 F.2d 626……………………………………………………………………….. 15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

iv

# I.     INTRODUCTION

Plaintiff MMCA Group Ltd. ("MMCA") respectfully submits this memorandum in opposition to Defendant Hewlett-Packard Company's ("HP") Motion for Summary Judgment or, in the Alternative, for Judgment on the Pleadings ("HP's Motion").  This action arises from the demise of an almost 20 year relationship between MMCA and HP, precipitated by HP's unlawful, knowing and malicious misappropriation of trade secrets that MMCA had developed over decades working as one of the premier private investigative firms in the United States.  HP's incremental attempts at termination of its 20 year relationship with MMCA,[1] and delivery of MMCA's trade secrets to MMCA's direct competitors, took place in response to MMCA's refusal to employ unethical tactics to entrap vendors in Latin America ("LAR"), as well as MMCA's rejection of HP's efforts to force MMCA to hire an unqualified friend of Rudy Diaz ("Diaz"), the Director of HP's Anti-Counterfeiting Program ("ACF") in LAR.  HP's breach of its contractual obligations to MMCA damaged MMCA's network of employees and operatives and, as HP intended, enabled MMCA's competitors to take MMCA's place in Latin America and Europe, the Middle East and Africa ("EMEA"). Thereafter, MMCA brought this lawsuit.

Five months before the discovery cutoff, and before a single deposition has been taken, and eleven months before the scheduled trial date, HP moves for summary judgment or, in the alternative, judgment on the pleadings.[2]

HP's arguments in support of its motion for summary judgment are also without merit.  It is significant that in a motion for summary judgment, which determines whether there are material and triable issues of fact in dispute, HP's twenty-five page brief contains only three pages of facts.

---

[1] As addressed below, to this day HP has never terminated the master agreement.

[2] Because HP has submitted hundreds of pages of exhibits to support its motion, the Court should reject the 'alternative' motion for judgment on the pleadings.  If the Court is inclined to consider a motion on the pleadings, MMCA requests and should be granted leave to amend the complaint to conform to proof, based on the already strong evidence of willful and malicious misappropriation.  Moreover, MMCA's evidentiary showing here includes proof that Pinkerton/BRI, Defendants previously dismissed by the Court, worked with HP to steal MMCA's most valuable operatives in Europe and the Middle East, and only stopped because MMCA was threatening legal action to protect itself from their depredations.  Based on the evidence presented in this Opposition, the Court may even want to reconsider its order granting judgment on the pleadings to those entities.

CIVIL ACTION NO.:  CV 06-07067-MMC (EMC)
**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**
**TO DEFENDANT HP'S MOTION FOR SUMMARY JUDGMENT**

1    The reason is simple.  The facts of this case, even with incomplete discovery, overwhelmingly

2    show that HP breached its contract with MMCA, willfully and knowingly misappropriated its

3    trade secrets, and interfered with MMCA's contracts with its employees, associates, and

4    operatives, and that MMCA was grievously injured as a result of those actions.

5          HP's arguments relating to the contract fall flat because the Master Services Agreement

6    ("MSA"), the contract at issue, was never terminated.  Instead, HP gave notice that it was

7    terminating a single purchase order issued pursuant to the MSA.  Indeed, MMCA performed under

8    the MSA up until the time this lawsuit was filed, and HP has repeatedly affirmed the MSA, never

9    claiming it was terminated.  HP's contentions related to the misappropriation of trade secrets are

10   devoid of merit given the flood of powerful evidence coming even from HP's own current and

11   former employees, whether it is Warren Rother, HP's past Regional Manager for the Anti-

12   Counterfeiting program in Europe/Middle East, ██████████████████████████

13   ████████████████████████████████████████████

14   ██████████████████████████████████████████████████

15   ████████████████████████████████████████████

16   ██████████████████████████████████████████████████

17   ████████████████████████   Geckler left HP's ACF program because of HP's unethical

18   dealings with MMCA.

19          MMCA's evidence of misappropriation is powerful, and the Court can and should deny

20   HP's motion on the merits.  However, discovery is still ongoing, and not even close to completion.

21   While there have been substantial productions of documentary evidence, there will be more

22   written discovery, and the first of many depositions are scheduled to commence in January.

23   Accordingly, concomitantly with this Opposition, Plaintiff is filing a Rule 56(f) declaration

24   describing other facts and evidence that could and would support denial of HP's motion. If the

25   Court cannot deny HP's motion without such additional evidence, HP's motion should be denied

26   under Rule 56(f) to allow further discovery to take place.

27

2

## II.    FACTUAL STATEMENT

### A.    MMCA's Formation and Development of its Means and Methods

It is standard in the investigation industry for investigation firms to develop proprietary means and methods for conducting investigations.  MMCA is no different, and HP, which profited mightily from MMCA's proprietary means and methods over the course of their almost 20 year relationship, knew all about it and proposed contract terms to address MMCA's concerns about protecting its trade secrets.[3]

MMCA was founded in 1972 by Morgan Cherry ("Cherry"), whose 38 year career in investigation spans insurance defense, fraud, product liability, malpractice and wrongful death, and included work as an investigator, supervisor and then partner with Legal Investigations, a general investigation firm ("LI").  LI was later hired by a large insurance company to investigate workers compensation fraud throughout the United States.  While working on nationwide fraud investigations, Cherry began to develop his own method of finding, evaluating, vetting, and training the best investigative talent available. (Declaration of Morgan Cherry, ("Cherry") ¶¶1,3, 5, 6).

MMCA eventually merged with Legal Investigations, retaining the name MMCA.  As a result of MMCA's growing reputation in products liability and fraud cases, it was hired in 1980/81 to investigate a case of counterfeit video arcade machines.   Within several months MMCA was conducting anti-counterfeiting ("ACF") investigations nationwide.[4]  During this time Cherry developed investigative methods using sophisticated data mining and processing to analyze and extend information developed by his field investigators, and MMCA also began to specialize in ACF work. (Cherry, ¶¶8, 9).[5]

---

[3] Throughout this motion reference is made to the declaration of Morgan Cherry and Tom Byrne. MMCA believes that the extensive experience of both individuals qualifies them as experts on the issue of investigative techniques and procedures, what is generally known and not known in the industry, and what constitutes trade secrets of investigative agencies.

[4] MMCA was one of the first private investigative firms to develop a truly national operational base, and developed a reputation for nationwide services through development of highly talented associates and contacts.

[5] MMCA also specialized in other intellectual property matters, such as patent infringement and trade dress.

1    MMCA expanded into the international arena with the advent of the internet, but

2    particularly so when Thomas Byrne ("Byrne") joined MMCA in 1995, after a 30 year career with

3    the United States Drug Enforcement Administration. (Cherry, ¶17).[6]  Through his career with

4    DEA, Byrne had developed an extensive network of contacts in domestic and foreign law

5    enforcement agencies, and these contacts were instrumental in expanding and staffing MMCA's

6    international presence.[7]  The means and methods used by MMCA for conducting investigations,

7    including the comprehensive vetting process for prospective MMCA associates.  The standards

8    and criteria used by MMCA in engaging associates is one of MMCA's proprietary methods of

9    investigation, and is a trade secret.  These means and methods were instrumental in developing the

10    ACF work that MMCA later performed for HP. (Byrne ¶¶7, 9, Cherry, ¶27).

11    ACF investigations are essentially investigations into potential criminal conduct.

12    Counterfeiting of product such as HP printing supplies, involves the manufacture of counterfeit

13    product at a facility, storage, a distribution network, manufacture of packaging materials including

14    boxes and labels mimicking authentic HP labels designed to thwart counterfeiting, and retail

15    outlets where the counterfeit products are sold to consumers.[8]

16    ████████████████████████████████████████████

17    ████████████████████████████████████████

18    ████████████████████████████████████████

19    ████████████████████████████████████████████

20    ████████████████████████████████████████

21    _____

22    (Cherry, ¶9).

23    [6] Byrne's career included directing a Worldwide intelligence operation of 300 employees as Director of
Intelligence Operations, as Special Agent in Charge of New York City directing 300 DEA employees, and
as Director, Office of Professional Responsibility (Internal Affairs) where he was responsible for

24    investigations of misconduct against 7,000 DEA employees worldwide.  Byrne participated in, managed,
and supervised thousands of investigations worldwide, and has testified before the United States Congress.

25    [7] ██████████████████████████████████████

26    ████████████████████████████████████████

27    ████████████████████████████  yrne ¶8, Cherry, ¶27).
[8] Counterfeiting activities are similar to drug trafficking, and often employ similar methods of
manufacturing and distribution, even sometimes the same people. (Byrne, ¶5)

4

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ████████████████████████ The techniques used by investigation firms, such as MMCA are

4 considered "methods" of investigation. The division of responsibility between researchers and

5 field operatives is itself considered a "method" for conducting investigations.  Some firms employ

6 teams of lawyers and/or accountants to assist in the analysis of evidence gathered by field

7 operatives, and to prepare sophisticated reports and conclusions as part of the conduct of

8 investigation, which is yet another "method" of conducting investigations. Firms in the industry

9 develop methods suitable for the types of investigations they undertake, and also to differentiate

10 themselves from other investigation firms. Their methods however, are invariably kept

11 confidential and are considered highly proprietary. ███████████████████

12 ████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████

17 ██████████████ Byrne, ¶6, Cherry, ¶¶9, 10)

18      MMCA always considered and made clear that the means and methods of conducting

19 investigations were trade secrets.  All were developed over long periods of time and with the

20 expenditure of significant time, money and other resources, and all have great value to MMCA,

21 and all were protected as trade secrets.  Whenever inappropriate contacts were made between HP

22 and MMCA's operatives, MMCA managers responded and made clear that it regards such

23 information as secret and that inappropriate contacts should cease.

**B.    MMCA's Work With HP**

24      In December 1994, MMCA was assigned to trace the origins of the first instance of a true

25 counterfeit of HP's toner product packaging, which was found in transit through an informant's

26

27

5

tip.[9] ████████████████████████████████████████████

██████████████████████. (Declaration of Lau Geckler, ("Geckler") ¶5). Ultimately, MMCA

came to be Berria's exclusive firm in Latin America (with the exception of Mexico), and was also

given responsibility and assignments in Asia Pacific, Europe, Middle East and Africa ("EMEA"),

and occasionally North America.  As HP's demands increased, MMCA ramped up and grew its

already existing networks to meet HP's growing needs. (Cherry, ¶¶ 22-26).

MMCA worked an independent contractor, not as an employee.  Under its working

relationship with HP, and later pursuant to a formal written contract, MMCA was responsible for

the conduct of its investigations.  (Geckler, 5, Cherry).  MMCA made every effort to maintain the

confidentiality of its trade secrets, and repeatedly communicated to HP that its executives,

managers, agents, and employees could only meet with MMCA operatives and employees with an

MMCA manager present. MMCA further made clear that the names, contact and other

information related to its investigators were MMCA trade secrets, as MMCA's investigators were

the means MMCA used to provide investigative services.  (Cherry, ¶39, Geckler, ¶7). At no time

did HP contend that investigator identities were not trade secrets.[10]  The identities of MMCA's

investigators was kept secret to the extent possible.  There were times, however, when it was

necessary to disclose the identities of MMCA's operatives to HP ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████ ████████████████████████████████████

██████████████████████████████The confidentiality and protection of the identities

_____

[9] HP started encountering problems with the unauthorized refilling and simulated repackaging of its toner cartridges in the early 1990s, and assigned MMCA to work on this problem throughout the U.S., through HP's Toner Products Manager Toni Berria.

[10] The identity and contact information for MMCA's operatives was so secret, and necessary to MMCA's operations, that when HP sought to communicate directly with MMCA's Asia Pacific Region operatives, MMCA stopped working in that region on HP's behalf, rather than agree to such contact. Whenever inappropriate contacts occurred, MMCA took steps to prevent them from continuing. (Cherry, ¶¶40, 48; Bryne ¶8).

[11] Berria initially determined the genuineness of a particular product, but as HP's needs and the ACF program grew, she would train MMCA managers in product identification, and the managers would in turn

6

1   of MMCA's investigators was consistent with HP's policies and rule that a vendor's people

2   reflected its time and resources, and were never to be abused by HP.  Turning the name of an

3   MMCA investigator over to one of its competitors would be a significant violation of this rule.

4   (Geckler, ¶¶8, 9).

5          Up until 2002, MMCA worked for HP without a formal written agreement.  In 2002,

6   however, HP demanded that MMCA enter into a Master Services Agreement to cover MMCA's

7   work.  At the time, HP owed MMCA hundreds of thousands of dollars for previously completed

8   work, and refused to pay until MMCA executed the MSA.  During the negotiation process, Cherry

9   repeatedly emphasized, and HP agreed to, the nature of MMCA's trade secrets.[12]  On December

10  16, ███████████████████████████████████████████

11  ████████████████████████████████████████████

12  ███████████████████████████████████████████

13  ████████████████████████████████████

14      ██████████████████████████████████████

15      ███████████████████████████████████

16      █████████████████████████

17  HP's proposed language was adopted and made part of the MSA at Section 9.2.  (Cherry, ¶¶45,

18  46).

19          In September or October 2002, Berria resigned and HP restructured its ACF program by

20  creating the LAR, EMEA, Asia Pacific and North America regions, and hiring a manager for each

21  region.  In October 2002, Rodolfo Diaz ("Diaz") was hired to manage the LAR.  Diaz knew little

22  about ACF work, and he immediately announced his intention to change the parameters of the

23  HP/MMCA relationship by managing MMCA's investigations and meeting directly with MMCA

24  associates.  Diaz' reshaping of the HP's ACF Program became more encompassing later when he

25  became the Worldwide Director of the ACF Program.  Up until that point, it had been HP's policy

26  ───────────────────────────────────────────────

    train MMCA's field investigators.

27  [12] On November 25, 2002, Cherry told Tom Howard, then HP's Global Anti-Counterfeiting Program
    Manager, that the identity and contact information for MMCA's investigative personnel, among other

                                                                                                7

that its investigative vendors were the ones responsible for the ACF investigations and for training their own investigators.[13]   Diaz changed that relationship and wanted to train the investigators himself, and in doing so interfered with MMCA's training, investigation, and services to HP.  In contrast to MMCA's trainings, Diaz' training was quite superficial and lacking in depth. (Geckler, ¶11).[14]

### 1.   HP Replaces MMCA in LAR and Passes Trade Secrets to PICA

In early 2003, Diaz expressed frustration with Leslie Raynor ("Raynor"), one of MMCA's case managers in the LAR.  Raynor was an excellent employee, and had been working successfully for years in the LAR with MMCA.  Diaz was unable to articulate any specific complaint about Raynor, but the reason for his displeasure soon became clear.  Diaz told Byrne that he wanted a replacement for Raynor in the LAR, and that he had the perfect candidate.  Diaz suggested that MMCA interview Luis Ortega.  Byrne interviewed Ortega and determined that he was utterly lacking in qualifications to be a case manager.  Moreover, Ortega told Byrne that MMCA was about to lose its contract with HP, and that the contract could only be saved if MMCA hired him.  In a later, recorded conversation with Cherry, Ortega said that he was friends with Diaz and knew how he worked.  Ortega insinuated that MMCA should hire him (Ortega) because he knew what to do to keep MMCA's troubled relationship with HP on good standing.  Prior to this conversation, MMCA had no inkling that there were any problems with its relationship with HP.  MMCA did not hire Ortega. (Cherry, ¶¶53,54, Byrne, ¶28)

Relations between MMCA and HP took another turn for the worse in late 2003, when Diaz

_____

things, were proprietary and needed protection.

[13] ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████  Geckler, ¶5).

[14] ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

1   attempted to involve MMCA in unethical and potentially illegal conduct. Diaz approached

2   MMCA case managers Art Barnes and John O'Neil, and asked them to undertake operations that

3   would involve entrapment. Diaz wanted MMCA's investigators to approach print shops with a

4   sample HP label, have the shop print labels, and then engage in a sting whereby the labels would

5   be seized as counterfeit product. Diaz' interest in such operations was to increase the 'scorecard'

6   of the 'value' of counterfeit product seized, and thereby enhance the apparent worth of the ACF

7   department to HP. MMCA refused to become involved in such operations. (Cherry, ¶¶52, 63-

8   66).[15]

9          Cherry and others at MMCA believed that there would be retribution for refusing to hire

10  Ortega.  Indeed, after MMCA's refusal, Diaz became Worldwide Director of the ACF Program,

11  and Ortega took his place as the LAR manager. Not surprisingly, on September 15, 2004, Ortega

12  ██████████████████

13  ████████████████████████████████████████████

14  ████████████████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████████████████████████████

    (Declaration of Erin Smart in Support of HP's Motion, Exh. B).

17         PICA was informed of HP's decision on September 22, 2004. (Cherry ¶¶ 55, 56, Letter to

18  Vincent Volpi, Frucht Decl., Exh. A).  Before or after obtaining the LAR contract with HP, PICA

19  made efforts – some of them successful – to contact and recruit MMCA's employees and

20  associates. ████████████████████████████████████

21  ████████████████████████████████████████

22  ████████████████████████████████████████

23  ████████████████████████████████████

24  ██████████████████████████████████████████

25  ████████████████████████████████████████

26  ─────────────────────────────────────────────
    LAR after MMCA. (Cherry, ¶¶36, 37)
    [15] After MMCA was replaced by PICA, MMCA learned that PICA engaged in several entrapment
27  operations, in which criminal complaints were filed against print shops or their owners, alleging the
    production of counterfeit labels. These types of operations occurred throughout the LAR. (Cherry, ¶¶64-
    66).

9

█████████████████████████████████████

(PICA Response to RFP, pg. 26, Frucht Decl. Exh. B)[16]

PICA was true to its word, and HP was accommodating in assisting PICA to poach MMCA's 'resources.'[17] █████████

████████████████████████████████

█████████████████████████████████████

████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████

████████████████████████████████

███████████████████████████████

█████████████████████████████████████

██████████████████████████

(Frucht Decl., Exh. D)(Cherry, ¶¶57-16, Byrne, ¶ 13).[18]

Shortly after learning that Toranzo was leaving to work for PICA, MMCA began to receive reports from its investigators that they were being contacted and solicited to work for

_____

[16] ████████████████████████████

███████████████████████████████████

██

████████████████████████████████

█████████████████████████████████

█████████████████████████ LAR.  MMCA subsequently learned that PICA had no presence in Brazil.  (Cherry, ¶¶ 55, 56).

[18] ██████████████████████████████

████████████████████████████

PICA. ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████). Ultimately, a number of MMCA's

operatives left MMCA to work for PICA, including Rocio Cvar, Renata Martinho, Mauro Chavez,

and Tatiana Gomes. Each of these individuals was trained in MMCA's methods of investigation,

and each possessed confidential and trade secret information related to MMCA. PICA took

enough MMCA personnel with enough knowledge and information of MMCA's operations and

trade secrets to set up and staff a LAR operation. (Cherry, ¶¶27, 62). Rocio Cvar, Toranzo's sister,

was a longtime employee of MMCA, was fully trained in its methods, and because she was

actively assisting in all of MMCA's LAR activities, had extensive knowledge of MMCA's

operations, as well as the identities of its operatives throughout the region.████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████Cherry, §61, Byrne, ¶16). ████████████████████

██████████████████████████████████████████████████████

██████████████████████Frucht Dec., Exh. E).

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████. (Byrne, ¶¶22-26, Cherry, ¶57, Frucht Decl. Exh. D).

     In addition to passing along the contact information for MMCA's operatives, HP also

provided PICA with MMCA's confidential pricing information prior to PICA's response to the

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

CIVIL ACTION NO.: CV 06-07067-MMC (EMC)
**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT HP'S MOTION FOR SUMMARY JUDGMENT**

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████ (Cherry, ¶¶74-77, Frucht

3 Decl., Exh. J).

4      After MMCA understood that PICA was trying to steal its most valuable assets, it

5 submitted an ethics complaint to Kevin Hunsaker, HP's chief ethics officer.  Cherry¶¶ 63, Exh.

6 11). █████████████████████████████████████████████████████

7 ████████████████████████████ ██████████████████████

8 ████████████████████████████████████████████████████████████

9 ██████████████████████████ (Cherry, ¶¶63; Exh. 12).  After MMCA's work in the

10 LAR was terminated, MMCA continued to work in EMEA and North America.

11      **2.      HP Replaces MMCA in EMEA and Delivers Trade Secrets to Pinkerton**

12      After HP delivered both LAR and MMCA's trade secrets to PICA, it continued its conduct

13 in EMEA.  Until 2005 the EMEA region was managed by Lau Geckler ("Geckler").  Geckler saw

14 MMCA as very successful, and recognized that "much of that success had to do with the methods

15 employed by the trained, well connected and experienced investigators MMCA recruited, trained

16 and developed in its network." (Geckler, ¶8). ██████████████████████

17 ████████████████████████████████████████████████

18 ███████████████████████████████████████████████

19 ████████████████████████████████████████ █████████

20 █████████████████████████████████████████████████

21 ██████████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ████████████████████████████████ (Geckler, ¶11).  Geckler was succeeded

24 by Warren Rother who proved to be less ethically challenged.

25      In late 2005, HP advised MMCA that it was submitting a RFP for the EMEA region.

26 MMCA knew it would lose EMEA, and the region went to MMCA's competitor Pinkerton. As

27 had occurred in the LAR, after losing the EMEA region, MMCA began getting reports that its

12

investigators were being contacted and solicited to work for Pinkerton. (Cherry, ¶70-71).

HP passed on the names and contact information of MMCA's operatives to Pinkerton. As a result, MMCA lost a number of valuable and impossible to replace operatives. One example is Hoda Hafez ("Hoda"), a female resident of Jiddah in the Kingdom of Saudia Arabia ("KSA"). KSA is one of the most difficult regions in the world to work in, and a very active arena for counterfeiters – and thus important to HP. Byrne spent four years searching for a Saudi investigator with Hafez' capabilities, and she was a unique find. Hafez works directly for the Saudi Royal Family, and for the Saudi National Guard, which oversees the Saudi government and answers only to the King. Hoda's position with the National Guard alone makes her unique and extremely valuable, as she can arrange a meeting with the most senior levels of government, can arrange for raids and seizures, and has significant influence. Hoda's value is also magnified by the fact that she can function in other Middle Eastern countries, which is a rare attribute. Hoda left MMCA for Pinkerton after Pinkerton took over the EMEA contract. (Byrne, ¶13).

[redacted]

(Frucht Decl. Exh. I at HP-MMCA00034853)

13

1 (Frucht Decl., Exh. F, at HP-MMCA00031653, emphasis added).

[████████████████████████████████]

[██████████████████████████████████]

[██████████████████████████████████]

[██████████████████████████████████████]

[████████████████████████████████████]

[████████████████████████████████]

8 ████████████████████████████████ 12).[20]

9      After MMCA lost the contract and operatives in EMEA, Cherry wrote a second ethics

10 complaint to Hunsaker.  This complaint was completely ignored, and there was never a response.

11 Despite losing both the LAR and EMEA regions, HP never gave notice to MMCA that the MSA

12 was going to be terminated.  (Cherry, ¶72, Exh. 14)

[██████████████████████████████████]

[████████████████████████████████████]

[████████████████████████████████████]

[████████████████████████████████]

[██████████████████████████████████]

18 (Cherry, ¶¶78-80).

19 **III.    LEGAL ARGUMENT**

20      **A.    Standard on Summary Judgment**

21      Rule of Civil Procedure 56 provides that summary judgment shall be granted "against a

22 party who fails to make a showing sufficient to establish the existence of an element essential to

23 that party's case, and on which that party will bear the burden of proof at trial . . . since a

24 complete failure of proof concerning an essential element of the nonmoving party's case

25 necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322

---

[20] ████████████████████████████████

████████████████  (Byrne, ¶19).

1  (1986).  There is a genuine dispute about material fact "if the evidence is such that a reasonable

2  jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477

3  U.S. 242, 250 (1986).  The Court's function on summary judgment is not to make credibility

4  determinations, Anderson, 477 U.S. at 250, and inferences to be drawn from the facts must be

5  viewed in a light most favorable to the nonmoving party. T.W. Elec. Serv. v. Pacific Elec.

6  Contractors Ass'n.,  809 F.2d 626, 631 (9th Cir. 1987).[21]

7      **B.      MMCA'S Contract Claims are Meritorious**

8          **1.      HP did not Terminate the Master Services Agreement.**

9  HP cites Paradee Oil Co., v. Phillips Pet. Co., 320 A.2d 769, 773 (Del.Ch. 1974) as support

10  that Delaware courts uphold provisions for contract termination without cause.  The Paradee court

11  also noted, "This rule, however, has been said to be subject to the qualification that such express

12  right of termination not be contrary to equity and good conscience and not be in violation of any

   limitation imposed by statute."  Id.

13      Section 1.1 of the MSA provides that MMCA will provide "the services set forth in the

14  *Statement of Work*."  The Statement of Work provides, "MMCA will provide investigative

15  services *worldwide*."  Section 16(c) of the Agreement provides for termination upon 60 days

16  notice without cause.

17      HP asserts it gave MMCA 60 days written "notice of termination in both the LA and

18  EMEA regions," pursuant to section 16(c) of the Agreement.  However, both notices inform

19  MMCA that HP intends to terminate "Purchase Orders."  The term "purchase order" appears

20  nowhere in the MSA, thus HP could not terminate by the notices HP offer as proof.  "As a general

21  proposition if a party who has the power of termination fails to give notice in the form or time

22  required by his reservation, it is ineffective as a termination."  Corbin, 6 Corbin on Contracts, §

23  1266 at p. 64 (1962).  "In the absence of an express provision providing for partial termination of

24  a contract, a contract cannot be partially abrogated under a termination provision."  17A C.J.S.

25  Contracts Section 403 (1963).

26

27  [21] The Court should reject HP's alternative motion pursuant to FRCP 12(c-d). "If matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment…"

15

1    Moreover, pursuant to <u>Paradee</u>, the Court must also examine the issue of equity and good

2    conscience underlying HP's attempt "termination notices."  Documents so far produced by HP

3    show that HP basically gave MMCA's operatives to PICA and Pinkerton.  Questions of equity and

4    good conscience exist that bar a summary judgment result.

5              **2.    MMCA Properly Claims Breach of the Non-Solicitation Clause.**

6         HP asserts that MMCA has no claim for HP's breach of the non-solicitation clause because

7    MMCA suffered no "compensable injury."  HP cites <u>Kronenberg v. Katz</u>, 872 A.2d 568, 606

8    (Del.Ch. 2004) where the court considered an alleged breach of a confidentiality clause.  The court

9    held the claim was not actionable because the agreement included the right to file suit in a court of

10   public record, thus, the information the plaintiffs sought to protect might not remain confidential.

11   <u>Id.</u> at 606-07.

12        More similar to the instant case is <u>RHIS, Inc. v. Boyce</u>, 18924 (Del.Ch. 9-26-2001).  There

13   the breach of a non-compete provision by a employee was enforced, but the court admonished that

14   while such breaches provide desirable additional consumer choice and price competition, the

15   resulting gain by offenders "must be controlled to the degree that [the plaintiff] had the right to

16   protect its proprietary interest in the goodwill it had developed over the years and to the degree

     that [it contracted] to do so."  <u>Id.</u>

17        In <u>RKI, Inc. v. Grimes, 177 F. Supp.2d 859 (N.D.Ill. 2001)</u>, the court delivered a scathing

18   opinion and levied substantial fines and penalties to a former employee and his new employer who

19   acted together to misappropriate trade secrets and breached non-compete and non-solicitation

20   provisions of the former employer's contract.  The facts of the case are remarkably similar to the

21   instant case, including the complexity of the issues and the various causes of action.

22            **3.    MMCA's Damages are not Precluded by the Services Agreement.**

23

24        Under Delaware law:  (1) a contract or clause will not be enforced in such way as to

25   produce an unconscionable result (6 Del. C. § 2-302); (2) a limitation on consequential damages

26   will not be enforced if it is unconscionable (Del. C. § 2-719); and (3) a limitation of liability or

27   remedy will not be enforced where the circumstances cause the contractual remedy to fail of its

     essential purpose (6 Del. C. § 2-719(2)).  "[T]<u>he Courts in this state have repeatedly recognized</u>

                                                                                              16

that the issue of whether limitation provisions are enforceable under the contractual relations of the parties . . . should not be decided on the pleadings or on summary judgment." <u>Hampton v. Warren-Wolfe Associates, Inc.</u>, 02C-10-037 WLW (Del.Super. 2004). <u>See also J.A. Jones Const. Co. v. City of Dover</u>, 372 A.2d 540, 552 (Del.Super. 1977)(<u>Determination of unconscionability involves an evaluation which is not permissible at the summary judgment stage</u> **[].** <u>Id.</u> at 551-52.

**4.      Even if the Limitation of Liability Provision is Enforceable, Which it is not, MMCA is entitled to the Benefit-of-the-Bargain Damages.**

"One injured by a breach of a contract is entitled to compensation such as will place him in the same position that he would have been in if the contract had been performed. The measure of damages is the loss actually sustained as a result of the breach of the contract." <u>JJ White, Inc. v. Metro Merch. Mart</u>, 107 A.2d 892, 894 (Del Super. 1954); *accord* <u>U.S. for Use of Endicott Ent. v. Star Brite</u>, (Del. 1994) 848 F. Supp. 1161, 1169 (damages for breach of contract should equal loss actually sustained).   HP contends that, at most, MMCA can claim damages for the benefits it would have received during the 60-day termination period specified in the termination provision, and for the reasonable costs of retraining replacement employees that left MMCA to join PICA. That measure of damages HP will not nearly place MMCA in the same position it would have been in if HP had performed the Agreement.   HP's breaches were calculated to enable PICA to establish sufficient operational capability to assume HP's ACF investigations in the LA and EMEA regions.  Doing so required misappropriating MMCA trade secrets and hiring MMCA operatives and employees.  Without such conduct by HP, it would have taken PICA years to develop the capability to assume those operations.  To place MMCA in the same position it would have been in if HP had not breached is thus the amount of profit it lost during the time it would have taken PICA to become, of its own devices, operationally able to service the HP contract. That measure is for benefit-of-the-bargain damages, and nothing more.  MMCA estimates the amount to be $43,886,296.

By contending MMCA's damages are otherwise limited, HP effectively concedes its summary judgment motion must fail.   The measures HP urges will arguably produce an unconscionable result, and Delaware law holds that whether the limitation provision is enforceable

17

or unconscionable may not be decided in summary judgment.

**C.     Triable Issues of Fact Exist on MMCA's Claim of Misappropriation of Trade Secrets**

**1.     The Identities and Contact Information of MMCA's Operatives MMCA's Were Confidential Trade Secrets**

Delaware's Uniform Trade Secret Act provides that a trade secret "shall mean information, including a formula, pattern, compilation, program, device, method, technique or process that:

    a.   Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

    b.   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

6 Del. Code Ann. Tit. 6, § 2001(4)(2008).[22]

Whether trade secrets are generally known or readily ascertainable, and whether a party has taken reasonable steps to protect the trade secret from becoming known is a question of fact. SmithKline Beecham Pharms. V. Merck & Co. 766 A.2d 442, 448.

An alleged trade secret derives actual or potential independent economic value if a competitor cannot produce a comparable product without a similar expenditure of time and money. This requirement of 6 Del. C. § 2001(4)(a) involves the notion of competitive advantage. It focuses on whether a plaintiff would lose value and market share if a competitor could enter the market without substantial development expense.

Miles Inc. v. Cookson Am., 1994 Del. Ch. Lexis 221 at 27.

While Plaintiff has not discovered any cases specifically dealing with the trade secrets of private investigation agencies, the identity of MMCA's operatives is in many ways to analogous to customer lists, which courts sometimes find to be trade secrets and sometimes not. The names of customers do not have to be unavailable or invisible to the public. If that were the case customer lists could never be trade secrets as long as customer names and phone numbers were in public telephone books. Similar to the approach in Miles Inc. supra, courts focus on whether "the employer has expended time and effort identifying customers with particular needs or

---

[22] Both Delaware and California have adopted the language of the Uniform Trade Secrets Act.

CIVIL ACTION NO.: CV 06-07067-MMC (EMC)
**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT HP'S MOTION FOR SUMMARY JUDGMENT**

1  characteristics." <u>Morlife Inc. v. Perry</u>, 56 Cal.App.4th 514 (1997).[23]  Put another way "a list of

2  subscribers of a service, build up by ingenuity, time, labor and expense of the owner over a period

3  of many years is property of the employer, a part of the good will of his business, and, in some

4  instances, his entire business.  Knowledge of such a list, acquired by an employee by reason of his

5  employment, may not be used by the employee as his own property or to his employer's

6  prejudice."  <u>Greenly v. Cooper</u> (1978) 77 Cal.App.3d 382,392.

7          Here, MMCA's Cherry and Byrne offer extensive testimony describing the time and

8  resources they expended in finding and recruiting their operatives.  Byrne searched for years to

9  find an operative in the KSA with the contacts and abilities of Hoda Hafez.  Similar efforts were

10  made to find Mohammed Shaltout as well as operatives in other geographical regions.  Some of

11  the operatives, such as Gabriela Toranzo, had no prior experience working for an investigation

12  firm before coming to MMCA, and they were trained and taught methods of conducting an

13  investigation and operating an agency that were unique to MMCA.  In other words, MMCA's

14  network of operatives was built up through its own "ingenuity, time, labor and expense…over a

15  period of many years."  MMCA's competitors had no way of finding its operatives without

16  assistance from HP.  HP's disclosure of these operatives to PICA not only put MMCA at a

17  competitive disadvantage, but it allowed PICA to take advantage of MMCA's years of investment,

18  and take over HP's LAR market without any substantial development expense.[24]

19          HP contends that the identities and contact information of MMCA's operatives is not a

20  trade secret because (1) their  effectiveness of agents comes from their knowing and being known

21  by law enforcement agencies, not from their secrecy; (2) MMCA shared the identities of its

22  operatives with HP, and the identities were also public through newspaper articles, court

23  _____

24  [23] <u>See</u> <u>also</u> <u>Del. Express Shuttle v. Older</u>, Del. Ch. Lexis 124 (2002)(contrasting <u>Town & Country House & Home Service v. Newbery</u>, N.Y.2d 554 (N.Y. 1957) where a customer list developed from "cold calling"

25  the white pages qualified as a trade secret, with <u>Dionisi v. DeCampli</u>, [1995 Del. Ch. Lexis 88] where a Rolodex with client names and addresses did not constitute a trade secret because the clients were easily

26  identified.)
   [24] It is interesting to note that, unlike its argument on MMCA's methods, HP makes no effort to argue that it

27  did not misappropriate the identities and contact information of MMCA's operatives.  That is because the
   evidence that they did so is simply overwhelming.

19

1    appearances, and the like.[25]  None of these arguments have merit.  "The mere fact that aspects of a

2    trade secret process can be found in publications does not mean that the process is not a trade

3    secret." <u>Sanirab Corp. v. Sunroc Corp.</u> 2002 Del. Super. Lexis 3509 at 9.  Nor does the fact that

4    MMCA disclosed trade secrets to HP mean they are not trade secrets.  If that were the case,

5    MMCA would be free to disclose all of the HP trade secrets that HP provided access to during

6    their relationship.  The secrecy element of a trade secret "is not lost, however, if the holder of the

7    trade secret reveals the trade secret to another in confidence and under an implied obligation not to

8    use or disclose it." <u>Kewanee v. Bicron</u>, 416 U.S. 470 (1974)(Citation omitted)  MMCA and HP

9    had a business relationship that required the mutual disclosure of trade secrets, and they had a

10   mutual agreement, later reduced to writing in the MSA, that defined MMCA's trade secrets and

11   mandated confidentiality.  This is well attested to in the Cherry and Byrne declarations, and if that

12   is not enough, it is also attested to by HP's own former EMEA manager Lau Geckler.

13         Finally, HP engages in circular logic by claiming that the value of the operatives was in

14   their knowing and being known by various agencies.  That is akin to saying that customer lists are

15   not valuable because they are secret but because they allow they facilitate the sale of goods or

16   services.  Like the customer list, MMCA's operatives were so valuable because MMCA had

17   invested so much in them and made them good at their work, and because they were unknown to

18   MMCA's.

19                    **2.      MMCA's Method are Trade Secrets**

20         Citing to <u>Self Directed Placement Corp. v. Control Data Corp.</u>, 908 F.2d 462 (9th Cir.

21   1990), HP argues that MMCA's purported methods are not confidential trade secrets because they

22   are obvious and/or because methods revealed to clients or apparent to the public are not trade

_____

24   [25] HP stretches its supporting evidence beyond belief.  None of the newspaper articles or court filings that
     HP proffers support HP's position.  If MMCA operatives are named at all, there is only a reference to a
25   name, and the contact information provided is that of HP headquarters or HP's attorneys - not the operative.
     MMCA is never mentioned (See HP Exhibits I-K, L-U, CC).  Further, HP falsely states that one of
26   MMCA's operatives "presented at a major public conference."  As noted by Tom Byrne, the operative in
     question, Hoda, did not 'present' and as a woman could not have in Saudia Arabia (Defendant's Exh. NN
27   to Smart Decl.)  Instead, she was in Riyadh to arrange for raids, and met with the Manager of the KSA
     Ministry of Commerce.  She did not participate in, let alone make a presentation to the group.

                                                                                                    20

1   secrets.  There is simply no comparison between the alleged trade secrets in <u>Self Directed</u> and

2   MMCA's methods.  <u>Self Directed</u> involved a program to teach unemployed or underemployed

3   individuals how to obtain work.  The types of secrets alleged included "the program being

4   conducted on consecutive days, beginning with Wednesday; instructor review and critique of

5   thank you notes; holding a surprise cocktail party prior to the normal ending time on the last day

6   of class; and conducting dress rehearsals for interviews on the last day of class." <u>Id.</u> at 465.  The

7   9th Circuit soundly and rightly rejected these claimed trade secrets.

8   █████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████████████

14  █████████████████████████████████████ MMCA's declarations affirm that these

15  methods are proprietary, and HP offers no evidence that MMCA's methods are obvious or

16  generally known in the 'industry.'  In fact, HP offers no evidence that there is an ACF industry.

17      Finally, HP argues that MMCA's claim fails because it has no proof that MMCA made use

18  of its trade secrets.  HP ignores the statute dealing with misappropriation, which states that

19  misappropriation also occurs when there is a "disclosure or use of a trade secret of another without

20  express or implied consent by a person who…at the time of disclosure…knew or had reason to

21  know that his or her knowledge of the trade was acquired under circumstances giving rise to a

22  duty to maintain its secrecy…" 6 Del. C. § 2001(2)(b).  MMCA alleges that HP disclosed its trade

23  secrets to PICA and Pinkerton, and, even though discovery is not yet complete, there is already

24  evidence to support this claim.  In the proposal that PICA submitted to HP's RFP, PICA outlines

25  its organizational structure and indicates that it has a case manager and assistant case manager for

26  each case, following exactly MMCA's structure.  PICA could only have derived this information

27  from HP.  Similarly, PICA was given information on MMCA's pricing structure, and even on the

1   cost of the hotline in Brazil.  Such information is also part of MMCA's means and methods for

2   performing its HP work, and by providing it to PICA, HP gave PICA a distinct and powerful

3   competitive advantage, without PICA having to invest anything in developing its knowledge or

4   methods.  Of course, all of these material facts are disputed by HP and PICA, which is the very

5   reason that summary judgment must be denied.[26]

       **D.**       **MMCA States a Claim for Interference with Contractual Relations**

6

7          **1.**       **MMCA Entered into Written Contracts with its Employees and**

8                      **Operatives.**

9        Under Delaware law, the elements of elements of interference with contract are: (1) a contract,

10  (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the

11  breach of such contract, and (4) resulting injury.  E.g., <u>Irwin & Leighton, Inc. v. W.M. Anderson</u>

12  <u>Co</u>., 532 A.2d 983, 992 (Del. Ch. 1987).  MMCA entered into written contracts with its operatives

13  that included non-disclosure and non-compete provisions and operatives.  The element of

14  existence of contract is satisfied.

15         **2.**       **It is Unreasonable for HP to Assert it was not Aware of MMCA's**
                       **Agent Contracts.**

16       HP asserts that it was unaware of the MMCA agent contracts.  However, "A contract will

17  be implied in fact [] when the Court may fairly infer such an intent from the evidence; it represents

18  the presumed intention of the parties as indicated by their conduct."  <u>Parfi Holding v. Mirror</u>

19  <u>Image Internet</u>, 794 A.2d 1211, 1238 (Del.Ch. 2001); 17A Am. Jur.2d § 13 ("An implied contract

20  between two parties is raised [] when the facts are such that an intent may fairly be inferred on

21  their part to make such a contract.").  MMCA informed and repeatedly reminded HP that its agents

22  were bound by confidentiality and non-compete contractual provisions and took reasonable

23  measures to safeguard the identities of their agents, informed HP why it believed it necessary to do

24  so, and revealed such information only when compelled by HP agents Diaz and Ortega to do so.

25  Under such circumstances, MMCA's conduct fairly infers that a contract of confidentiality existed

26

27  [26] It is true, of course, that MMCA doesn't have full knowledge of the extent to which PICA has adopted
    and used its trade secrets.  For that reason, if the Court for any reason is inclined to grant HP's motion, it
    should first continue the hearing to allow discovery to proceed.

                                                                22

1    between MMCA and its agents.  Diaz and Ortega are especially accountable for such an inference

2    as investigations specialists aware of the need for confidentiality.

3                    **3.      HP's Interference with MMCA's Contracts was a Significant Factor**
                              **Causing Breach.**
4

5         MMCA agent defection to PICA could not have occurred without HP's help.  PICA had no

6    independent knowledge of those agents' identities, and no way of obtaining that information other

7    than through HP.  This is sufficient cause of breach to support MMCA's claim.

8         HP further asserts its conduct in soliciting MMCA employees was not "wrongful" because

9    it constitutes only a contract breach.  That assertion is specious.  "[T]he same circumstances may

10   give rise to both breach of contract and tort claims if the plaintiff asserts that the alleged

11   contractual breach was accompanied by the breach of an independent duty imposed by law." Data

12   Management Internationale, Inc. v. Saraga, C.A. No. 05C-05-108, 2007 (Del. Super. July 25,

13   2007), 2007 Del. Super. LEXIS 412.

14        **E.      MMCA Cannot State an Actionable Claim for Interference with Prospective**
                   **Economic Advantage against HP**
15
          MMCA will proceed with its claim for interference with prospective economic advantage
16
     against PCI.
17
               **F.      HP Breached the Implied Covenant of Good Faith and Fair Dealing**
18
          HP contends that MMCA cannot assert a claim of implied covenant because:  (1) HP
19
     properly terminated the Agreement via the "unambiguous terms" of the termination clause; and (2)
20
     MMCA may not bootstrap an implied covenant claim to a claim for breach of the non-solicitation
21
     clause because the claims would be based on exactly the same acts.  HP cites Cincinnati SMSA
22
     Ltd. v. Cincinnati Bell, 708 A.2d 989 (Del. 1998), which held a court can find an implied covenant
23
     of good faith and fair dealing, "In cases where obligations can be understood from the text of a
24
     written agreement but have nevertheless been omitted in the literal sense, [thus requiring] a court's
25
     inquiry [to] focus on what the parties likely would have done if they had considered the issue
26
     involved." Id. at 992.

27        Application of the covenant is not as restrictive as HP suggests.  "The Supreme Court has

     made it explicitly clear that the implied covenant of good faith and fair dealing . . . attaches to

                                                                                                    23

1  every contract." <u>Dunlap v. State Farm Fire & Cas. Co.</u>, 878 A.2d 434, 441-42 (Del. 2005). [27]

2  As discussed <u>supra</u>, HP did not terminate the MSA, or at best HP's claim is ambiguous and a

3  disputed material issue of fact.  Nothing in the Agreement provides for regional termination.  Had

4  the parties considered that issue, it is unlikely HP would enable MMCA to terminate the

5  Agreement by geographic portions, at its sole discretion.  Doing so would jeopardize the

6  consistency and stability HP appears to have sought with a worldwide services agreement.

7  Second, nothing in the Agreement provides that partial termination constitutes termination of the

8  entire agreement if such termination becomes legally advantageous.  Had the parties considered

9  that issue, HP likely would have realized MMCA could terminate its services in any region, and

10  then claim total termination in order to avoid legal liability if the need arose.

The same set of operative facts does not, as HP asserts, underlie MMCA's breach of the

11  non-solicitation clause and its implied covenant claim.  Although any solicitation of an MMCA

12  agent constitutes breach of the non-solicitation clause, doing so with intent to facilitate PICA's

13  hiring of those agents also raises underlying issues of statutory violations and intentional tort, as

14  discussed <u>supra</u>.  By doing the latter, HP did not "violate an express term of the agreement," but it

15  "used oppressive tactics to deny MMCA the benefit of the bargain," and "breached the covenant

16  by conduct that takes advantage of its position in order to frustrate the purpose of the contract."

17  **G.    HP Wrongly Asserts MMCA Cannot State a Claim for Conspiracy**

18  Under Delaware law, to state a claim for civil conspiracy, a plaintiff must plead facts

19  supporting (1) the existence of a confederation or combination of two or more persons; (2) that an

20  unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual

21  damage to the plaintiff.  <u>Patterson-Woods V. Rlty. Enter.</u>, 05C-01-224-JOH (Del.Super. 5-27-

22  2008) at 12. [28]HP wrongly asserts that MMCA's fails to state an underlying tort.  As discussed

23

24  _____

25  [27] The covenant serves "to protect the spirit of the agreement when, without violating an express term of the
agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties'
26  bargain." Id. at 442.  A party breaches the covenant "when its conduct frustrates the overarching purpose
of the contract by taking advantage of [its] position . . . ." <u>Id.</u>
27  [28] Under both California and Delaware law, civil conspiracy is not an independent cause of action, and thus,
a civil conspiracy claim must be predicated upon an underlying wrong. <u>Entertainment Research Group, Inc.</u>

24

supra, MMCA states underlying tort claims for interference with contractual relations, misappropriation, and breach of the covenant of good faith.  HP's motion fails in this regard.

California and Delaware also apply a heightened pleading standard to claims of civil conspiracy.  Entertainment Research, supra 122 F.3d 1211; Ramunno, supra, 705 A.2d at 1039.  Allegations of conspiracy must be particularized by, e.g., stating the period of the conspiracy, the object of the conspiracy, and actions of the alleged conspirators taken to achieve that purpose.  Kalmanovitz v. G. Heileman Brewing Co., 595 F. Supp. 1385, 1401 (D. Del. 1984).  MMCA's allegations are not sufficiently particularized.  However, MMCA has discovered evidence of particular acts that support its conspiracy claims, including evidence that HP provided PICA with MMCA pricing information, and that HP assisted PICA in misappropriating MMCA trade secrets.  With leave of the Court, MMCA can readily plead its conspiracy claim with sufficient particularity.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny partial summary judgment.  If the Court is inclined to grant any portion of Defendant's motion, time to complete discovery should be allowed.

Dated: December 3, 2008                                   Litton & Geonetta, LLP
                                                          Law Offices of Kenneth Frucht


                                                  By:_____/s/_____
                                                          Kenneth Frucht
                                                          Attorney for Plaintiff MMCA

---

v. Genesis Creative Group, Inc., 122 F.3d 1211 (9th Cir. 1997) (applying California law); Ramunno v. Cawley, 705 A.2d 1029, 1039 (Del. 1998).

25